IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JUDITH SIZEMORE,

                Plaintiff,

   vs.                                        CIVIL NO.  04-272 JP/DJS

CONROY CHINO, New Mexico
Secretary of Labor, et al.,

                Defendants.

DENNIS MONTOYA,

                Movant.

## MAGISTRATE JUDGE'S FINDINGS, ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

THIS MATTER is before the Court pursuant to an Order of Reference [Doc. 162].  Two sets

of Defendants--State and RCI--as described below, were awarded summary judgment in this civil

rights action.  Plaintiff did not appeal the ruling as to the RCI Defendants, and the Court's ruling as

to the State Defendants was affirmed by the Tenth Circuit.  Sizemore v. New Mexico Dept. of Labor,

182 Fed. Appx. 848 (10th Cir. 2006).  Thereafter, Defendants sought an award of attorney fees under

42 U.S.C. § 1988 against the Plaintiff Judith Sizemore ("Sizemore").  State Defendants made a

separate request for attorney fees against Sizemore's counsel under 28 U.S.C. § 1927.

On March 31, 2005 the trial court determined that fees should be awarded [Doc. 110].

However, to determine the reasonableness and necessity of the fees requested, and to determine the

---

[1]Within ten (10) days after a party is served with a copy of this analysis and recommended disposition,
that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and
recommendation.  A party must file any objections within the ten-day period allowed if that party wants to have
appellate review of the analysis and recommendation.  If no objections are filed, no appellate review will be
allowed.

ability of Sizemore and her attorney to pay, the matter was referred to the undersigned magistrate judge to conduct a hearing and prepare a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).

On August 29, 2006, the Court conducted an evidentiary hearing. Thereafter, upon receipt of the transcript of proceedings, the Court requested additional information from Defendants.[2] The information was produced on September 26, 2006. The Court, therefore, issues its report and recommendation

### Findings

1. Sizemore was an employee of the State of New Mexico, Department of Labor. She was hired in May 1995 to head the Department's Management Information Systems Bureau ("MISB").

2. Sizemore was also responsible for the direct supervision of six employees, including her administrative aide and friend, Sylvana Luciani ("Luciani"), and she indirectly supervised 50 employees.

3. As a supervisor, Sizemore was responsible for ensuring that employees performed their work and adhered to policies, procedures and regulations of the Department of Labor. She was also responsible for approving sick, annual, administrative and FMLA leave requests, and for evaluating the performance of employees under her direct supervision, including Luciani.

4. One of Luciani's duties, among others, was serving as the Department's timekeeper and, thus, she was responsible for reviewing and maintaining leave accounts for all employees. Her desk was situated directly outside of Sizemore's office. Thus, Sizemore was able to observe on a daily basis whether Luciani was or was not at work or at her desk.

---

[2]The Court requested the complete RCI investigative report; only a portion had been previously submitted.

2

5.  For a number of years, there had been rumors and office gossip concerning abuse of leave policies, specifically relating to Luciani.  The gossip and rumors concerned Luciani's frequent absences on Fridays and Mondays, her late arrivals and early departures, and claims that she was not submitting leave slips for her absences, thus receiving both her full-time salary and not incurring any time debits on her leave account.

6.  In October 2002, two MISB employees, Virginia Baca and Loraine Habberman, advised Terry Othick, an IS consultant in the MISB, that Luciani was not accurately recording her absences.  Terry Othick began surreptitiously monitoring and recording Luciani's absences.

7.  The rumors concerning Luciani's leave abuse ultimately culminated in several employees, including supervisors, bringing the leave abuse concerns to Sizemore's attention.  The supervisors later gave statements to the effect that Sizemore told them to "mind your own business."

8.  Following the issuance of a January 22, 2003 complaint to the Department Secretary concerning falsification of time sheets, an investigation into the claimed leave abuses was ordered.

9.  An "in-house" comparison between payroll records and Luciani's known absences reflected a disparity.  Luciani was being paid for time not worked.  Based on those initial observations, the Department of Labor contracted with Robert Caswell Investigations ("RCI") to investigate.

10.  RCI is a licensed and bonded private investigative company that has been in business for twelve years, and provides "claims and investigative services."

11.  Its principal, Robert Caswell, served with the Albuquerque Police Department for twenty years.  Following his retirement as an APD officer and head of the Police Department's Civil Litigation Division, he was hired by Blue Cross/Blue Shield and conducted insurance investigations.  Ultimately, Robert Caswell and other principals started RCI and made their professional and

3

investigative services available to government, private businesses and individuals.

12. RCI is not an "employee" of the State.  It is an independent contractor that offers services to others under a professional services contract.

13.  In March 2003, the State of New Mexico contracted with RCI to investigate allegations that Luciani was violating the State's policies and procedures in reference to sick, annual and administrative leave, as well as violating the Department of Labor's code of conduct for employees.

14.  The allegations concerning the abuses pertained to Luciani's alleged failure to submit leave slips and not have her leave balance debited for her time away from work; falsification of leave records to benefit her leave balances; falsification of records relating to other employees; and, whether her supervisor, Sizemore, was aware of the alleged violations and failed to take appropriate action.

15.  As part of its investigation, pursuant to its contract with the State, RCI utilized the same protocols and procedures used in investigating private company employees.  In this case, it reviewed Luciani's time sheets, leave records, phone records, electronic access logs, as well as time and leave slips and similar documents for other employees within the Department, and conducted numerous interviews of Department personnel.

16.  The State of New Mexico did not direct or control the details of the investigation, nor did it require RCI to use specific protocols, policies or procedures.

17.  Comparisons between eye-witness logs that showed Luciani's absences, reviews of her time and attendance sheets, phone records, and security access card swipes showed 80 instances between January 2002 and February 14, 2003 where Luciani was absent, arrived late or left early. Luciani failed to document those absences, late arrivals, or early departures on her leave slips.  RCI also documented that Sizemore allowed Luciani to take a month of FMLA leave when her granddaughter was born.

4

18.  RCI decided whom to interview and interviewed numerous witnesses, including Luciani, Sizemore, Ken Hudzig, Mike Broward, Terry Othick, Ron Gutierrez, Art Roach, Shelley Martinez, Naomi Vázquez, Virginia Baca, Lorraine Habberman, Stan Valdez and Art Martinez.

19.  Information gleaned during the course of examination of the time sheets, leave slips, payroll records, access logs, as well as the multiple interviews, led to further allegations concerning violations of the State's policy, procedures and code of conduct by other employees.

20.  RCI's completed investigation concluded that Luciani failed to submit leave slips and failed to have her leave account report debited for time she was away from work; that Luciani falsified her own records by claiming to be at work and receiving pay for time that she was actually absent; and that Luciani claimed to be at work and received compensation for days and times that she was absent.  The investigation demonstrated that Luciani's leave abuse was a problem of long duration, perhaps years, and throughout that time, Sizemore had taken no corrective action, nor had she put an end to the leave abuse practice.

21.  RCI evidence also showed that Sizemore failed to properly supervise Luciani; that she certified as correct Luciani's time sheets and leave records, even though they were incorrect; that she knew or should have known of the leave abuse and failed to act; that Sizemore, too, failed to submit leave slips for her own absences and, thus, was compensated as if she had worked and was not debited for time off in her leave records.

22.  Sizemore acknowledged that other employees, including supervisors, had brought Luciani's absences to her attention, but Sizemore contended that the leave slip problems and leave account reports were the fault of the State's Human Resources Department, and took no personal responsibility for the lapses.

23. Sizemore said that, due to her own concerns about Luciani's absences, she "counseled" Luciani and had addressed the issue in Luciani's evaluations by including adverse comments in the evaluation..

24. Sizemore's statement concerning adverse comments was not supported by the records. To the contrary, Sizemore evaluated Luciani as "exceeding expectations" in Luciani's time and attendance evaluations.

25. Sizemore was aware of the pattern of leave abuse by Luciani, and instituted no management control to stop the conduct.

26. Upon completion of its investigation, RCI tendered its investigation report to the State. RCI had no participation or involvement in any subsequent disciplinary action taken by the State.

27. The State took disciplinary action against several employees as a result of the evidence gathered and the witness statements produced during the course of RCI's investigation--five male and female employees of various races and ethnicities.

28. The investigation resulted in the Department of Labor initiating disciplinary actions, including terminating three individuals--Luciani (Hispanic woman), Sizemore (Anglo woman), and Glen Young (Anglo male). Several others were disciplined or put on notice of proposed discipline, including Stan Valdez (Hispanic male), and an African-American female was notified of proposed discipline, but that proposal was rescinded.

29. Thus, in addition to the three terminations, an Hispanic male manager received a suspension because of his failure to appropriately supervise one of his subordinates. That employee's violation was isolated and involved a single violation of policies and procedures and was not comparable to Sizemore's. The State also disciplined and, ultimately, discharged Sizemore because of a pattern of neglect and misconduct that was viewed as so egregious that the Department could

no longer continue the employment.

30.  The State of New Mexico provided Sizemore with a notice of contemplated action for multiple infractions and, thereafter, considered Sizemore's written response to the proposed contemplated action.  Ultimately, the State concluded that the evidence supported Sizemore's dismissal based on multiple violations of rules and policies, including failing to properly supervise subordinates within Sizemore's direct supervisory responsibility, lying to a supervisor, insubordination, failing to properly account for Sizemore's own work hours, abuse of leave time, and engaging in abusive use of personal computer during works.  Based on these conclusions, the Department determined that the severity and pervasiveness of the offenses warranted dismissal and a notice of final action was provided to Sizemore, terminating her employment as of May 6, 2003.

31.  Sizemore utilized her appellate rights under New Mexico's Personnel Plan and proceeded to an evidentiary hearing.  Inexplicably, the State's hearing officer never decided the appeal.  More than two years has elapsed from the date of the hearing, with no decision having been made.

32.  Sizemore filed claims with the U.S. Equal Employment Opportunity Commission alleging discrimination based on various categories of protected status, including race, age and gender.

33.  On November 25, 2003, the EEOC provided Sizemore with the results of its own investigation on her claims, and concluded, with specific reference to information obtained during the course of its own investigation, that there was no evidentiary support for the claims of discrimination.

34.  Notwithstanding the results of the RCI investigation, the State's own determination concerning the egregious nature of the violations, or EEOC's investigation, Sizemore filed suit against the State of New Mexico, various individual State defendants and RCI, raising claims under 42 U.S.C. § 1983, Title VII, and various common law claims.

35.   Both RCI and the State of New Mexico filed separate motions for summary judgment, and both motions were ultimately granted and the lawsuit dismissed.  The dismissal was affirmed on appeal.  182 Fed. Appx. 848 (10th Cir. 2006).

36.   Robert Caswell Investigations ("RCI") has been in business for twelve years.  The Sizemore litigation was the first lawsuit ever filed against RCI, and the first time that RCI was required to be represented by counsel.

37.   RCI has a liability policy for which it paid premiums.  Upon being sued, RCI tendered the defense of the suit to its insurer who retained the Madison, Harbour & Mroz law firm ("Madison firm") as counsel.

38.   During the course of the litigation, the Madison firm kept RCI apprised of developments in the case and provided monthly billing statements.  These statements were reviewed by Robert Charles Casey, one of the principals of RCI, and Mr. Casey believes that the fees for services rendered were reasonable and necessary.

39.   Attorney William C. Madison, lead counsel on behalf of RCI, did not bill RCI's insurance carrier at his standard rate.  Mr. Madison is an experienced and highly skilled trial lawyer with over 30 years of experience.  He billed for his services at the rate of $165 per hour, a figure substantially below his standard rate and substantially below the rate charged by experienced trial lawyers for comparable services.

40.   A second partner in the Madison firm is Shannon Parden, who billed at an hourly rate of $150.  This rate, as well, is well below attorney Parden's standard billing rate, and substantially below the rates charged by other attorneys of comparable experience performing comparable services.

41.   Mr. Madison assigned associate attorneys to assist in the defense of this case, including Arlyn Crow, who billed at an hourly rate of $125.  This rate is the same or similar to rates by

associate attorneys performing comparable services.

42.  The below-standard rates charged were due to the ongoing professional relationship between the Madison firm and its insurance client.

43.  The services performed by the Madison firm were reasonable and necessary.  Indeed, the rates charged for the work performed were well below standard rates charged for comparable services by attorneys in the community.[3]

44.  The Madison firm reviewed billings and, from time to time, made adjustments primarily in the area of reductions to ensure that their billing was not excessive.

45.  The services performed by the Madison firm were professional, appropriate, and reasonably necessary in this case.  The legal services performed were also successful in that RCI was dismissed as a defendant on RCI's motion for summary judgment, along with three RCI employees who had also been named as Defendants.  Thus, the Madison firm won full vindication for its client, RCI.

46.  Pursuant to 42 U.S.C. § 1988, RCI and the three employees sought an award of attorney fees against Judith Sizemore.  RCI seeks a total of $54,313.04.  In an earlier ruling, the trial judge, the Honorable James A. Parker, found that RCI and the employees were prevailing parties, and that Sizemore's claims against the RCI Defendants were "unreasonable and without foundation even though they were not brought in subjective bad faith."  [Doc. 110].  The Court provisionally granted the RCI defendants' request for attorney fees subject to a hearing to determine reasonableness and Sizemore's ability to pay.

---

[3]The Court notes that Madison, Harbour & Mroz fees were approximately 50% of the fees charged by co-Defendants' attorneys.

47.  The Hinkle, Hensley, Shanor & Martin law firm ("Hinkle firm") in Santa Fe, New Mexico was retained as counsel to represent the State of New Mexico and all State Defendants in this lawsuit. Ellen Casey, a skilled and experienced trial lawyer, served as lead counsel.  Ms. Casey has been an attorney for twenty years and works primarily in the area of civil rights and employment cases.

48.  Ms. Casey provided professional legal services to the State Defendants for sixteen months, and during her defense of this case, utilized the services of two or three associate attorneys.

49.  Ms. Casey kept her clients apprised of developments in the case, provided her clients with status reports and copies of pleadings, and provided sound legal advice.  Ms. Casey worked in conjunction with the Department of Labor's in-house counsel, Doris Duhigg.

50.  Ms. Casey's clients were pleased with her work and believe that her billings were fair and reasonable for the work performed.

51.  Ms. Casey's usual billing rates as a senior trial attorney are substantially higher than the rates she charged in this case.

52.  Pursuant to Risk Management policies, the State of New Mexico pays associate attorneys $70.00 an hour and $125.00 an hour for partners.  These rates are substantially less than Ms. Casey's standard billing rates to non-governmental clients.[4]

53.  The Hinkle firm billed the State of New Mexico approximately $104,000 for its defense of this case.

54.  Ms. Casey's performance in this litigation can be characterized as outstanding.  The results were exceedingly favorable to her clients, as she obtained a summary judgment dismissing all of Sizemore's claims.  Thus, she obtained full vindication for her clients.

---

[4]Ms. Casey's billing rate in this case is likely $100 an hour less than work she charges in comparable litigation.

55.   The Court's own review of her billing statements showed that the time Ms. Casey spent was reasonable and necessary in the defense of the case, and that the fees charged for services performed were well within, if not substantially below, the fees charged for comparable legal services in this district.

56.   Defendant State of New Mexico and five State employees sought an award of fees against Sizemore pursuant to 42 U.S.C. § 1988, and sought an award of fees against attorney Dennis Montoya under 28 U.S.C. § 1927.  Requests for fees under § 1988 are against a party; requests under § 1927 are against the party's attorney.

57.   On April 18, 2005, the trial court granted State Defendants their motion for summary judgment [Doc. 116].  Sizemore, through counsel, continued with her litigation activities, seeking to set aside the Court's earlier ruling provisionally granting RCI attorney fees.  She also sought to file out-of-time responses to earlier motions, as well as motions to amend or alter the Court's grant of summary judgment.

58.   The litigation activities which Sizemore, through her counsel Dennis Montoya, pursued after April, 2006 needlessly prolonged and increased the costs of the ligation.

59.   From the date of summary judgment, the State incurred additional attorney fees of $6,448.50.

60.   The litigation expenses which the State Defendants incurred after the date of summary judgment would not have been incurred but for the numerous motions filed by attorney Montoya after summary judgment was granted.

61.   Judith Sizemore ("Sizemore") is age 59, unemployed and currently unemployable.  She has not been employed since the loss of her State employment.  In December 2005, she was diagnosed with a rare and incurable cancer--multiple myeloma.

62. Multiple myeloma is a " malignant neoplasm of plasma cells usually arising in the bone marrow and manifested by skeletal destruction, pathologic fractures and bone pain." <u>Dorland's Illustrated Medical Dictionary</u>, 859 (26 ed. 1981). This disease results in persistent skeletal pain, renal failure, and recurrent bacterial infections. The most common presentments are pathologic fractures and vertebrae collapse. They later may lead to spinal cord compression and paraplegia. <u>The Merck Manual</u>, 965-66 (17th ed. 1999).

63. In the progression of this disease, the marrow expands, causing bones to crack and break. At the time of the evidentiary hearing, Sizemore was suffering from broken ribs as a result of the expanding marrow. She has fractures and breaks in her spinal column due to this illness.

64. Sizemore is receiving treatment for her condition at the University of Arkansas International Myeloma Treatment Center. As this facility is an "out-of-network" facility under provisions of her medical insurance, the treatment is not fully covered by her policy. Sizemore must pay 40% of the fees for out-of-network treatment.

65. Sizemore is preparing for an experimental stem cell transplant procedure which requires extensive chemotherapy. Thereafter, if the transplant is successful, the recuperative period could be upwards of six months.

66. Because her condition is rare and is generally considered incurable, there is no guarantee that the stem cell transplant will be viable or effective. If the transplant is not successful, the median survival rate for this disease from onset is relatively short and measured in only a few years. <u>Id.</u>

67. Sizemore's out-of-state and out-of-network cancer treatment is costly. During the treatment period in Arkansas, she is required to incur airfare, lodging and transportation expenses. Sizemore submitted requests for reimbursement for these expenses to her insurer, but as of the date of the hearing, no approval had been granted and no reimbursement had been received.

12

68. Sizemore can no longer work and earns no income.  Her only income stream consists of her share of a former husband's military pension, from which she receives $1,650 per month.  As this amount is insufficient to meet her living expenses and medical needs, on a monthly basis, she draws down from a mutual fund account, which, at the time of the hearing, had a balance of approximately $24,000.

69. Her monthly living expenses, which are modest, are significantly greater than her monthly income stream.  Thus, on a monthly basis, she is drawing down from her savings and will likely have to draw down from her retirement funds when she is eligible to withdraw funds.

70. Sizemore owns a home in Albuquerque valued at a range between $200,000 to $250,000.  This home has a current $65,000 mortgage.  If forced to sell her home to pay attorney fees, she would have no place to live.  Sizemore also owns 14 acres of undeveloped property near Belen, New Mexico.  This property has been on the market for several months at an asking price of $26,000, but no offers have been made.  She owns a vehicle with a value of $10,000.

71. Sizemore has an IRA ($396,541), as well as a Roth IRA ($28,000).  Given her age, however, she is not yet able to draw funds from her retirement account without incurring substantial penalties.[5]

72. Moreover, Sizemore's IRA funds are intended to provide for her old age, and, depending on the progression of her disease, may have to be drawn upon for necessary medical care and treatment.

73. Sizemore has a vested, unmatured, retirement account through the Public Employees Retirement Act that has a lump-sum value of $83,000.  This fund, like the IRAs, may not be drawn

---

[5]However, at age 59 ½, Sizemore could begin withdrawals without penalty.  Those withdrawals would be taxable as ordinary income.

upon at present as Sizemore has not reached the requisite age.

74.  In liquid assets, Sizemore has less than $10,000, consisting of a savings account of $8,000, and a fluctuating balance checking account with about $1,500.

75.  Sizemore's retirement account and IRAs are protected by state and federal law from attachment, garnishment or judgment.

76.  Sizemore anticipates the expenditure of an additional $30,000 to $50,000 as her portion of the expenses of upcoming medical procedures recommended by her physician.

77.  Sizemore's prescription expenses are similarly high.  She is in a treatment protocol with the drug Thalidomide, and the amount she is required to pay under her health plan for a monthly supply is $250.

78.  A recent MRI taken at the University of Arkansas included a co-pay, not covered by her insurance, of $6,700.

79.  Sizemore's unemployment, unemployability and medical condition--multiple myeloma-- require that the Court give special consideration to her ability to pay attorney fees.

## Analysis

In this lawsuit, two separate fee requests were presented to the Court.  Defendant RCI and State Defendants sought an award of fees against Sizemore pursuant to 42 U.S.C. § 1988.  In addition, State Defendants made a separate fee request under 28 U.S.C. § 1927 as against attorney Dennis Montoya.  RCI does not seek § 1927 fees from Montoya.

The two fee-shifting statutes at issue in this case have different purposes and work in somewhat different ways.

42 U.S.C. § 1988 is titled "Proceedings in Vindication of Civil Rights," and subsection (b) permits the Court, in its discretion, to award a reasonable attorney's fee to the prevailing party as part

of the costs.  The purpose of allowing attorney fees to a prevailing *plaintiff* in civil rights suits is not to penalize defendants, but rather to encourage compliance with and enforcement of civil rights laws. Collins v. Chandler Unified Sch. Dist., 644 F.2d 759 (9th Cir. 1981).

There is no public purpose to be served, however, in encouraging frivolous, unreasonable, or meritless claims or in encouraging a plaintiff to continue litigating after a suit clearly becomes so; in such cases, the court should award attorney fees to defendants.  Rounseville v. Zahl, 13 F.3d 625 (2d Cir. 1994).  This is true even if the suit was not brought in subjective bad faith.  Brown v. Borough of Chambersburg, 903 F.2d 274 (3d Cir. 1990), *citing* Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694 (1978).

But the prospect of having to pay defendant's attorney fees should not, in theory, deter plaintiffs from filing suit if the case is unsuccessful.  While prevailing plaintiffs are entitled to attorney fees "almost as a matter of course," a prevailing defendant must show that the suit was frivolous, unreasonable or groundless before a court will force the plaintiff to pay defendant's fees.  Bittner v. Sadoff & Rudoy Indus., 728 F.2d 820, 829 (7th Cir. 1984); United States v. Mississippi, 921 F.2d 604, 609 (5th Cir. 1991).

28 U.S.C. § 1927, the federal statute providing that counsel will be liable for excess costs, expenses, and attorney's fees incurred by counsel's unreasonable or vexatious actions serves a somewhat different purpose.  Section 1927 is designed as a sanction against dilatory litigation practices and is intended to require attorneys to personally satisfy excess costs attributable to their misconduct.  Piljan v. Michigan Dept. of Social Servs., 585 F. Supp. 1579, 1583 (D. Mich. 1984). The statute is specifically designed to deter bad faith conduct by any attorney, Herrera v. Scully, 143 F.R.D. 545, 552 (S.D.N.Y. 1992), whether representing plaintiffs or defendants.  The statute applies in all cases, not just civil rights actions.

Both statutes serve deterrent purposes.  However, the civil rights statute is meant to encourage meritorious cases while discouraging frivolous ones, whereas attorneys are presumed to be motivated by their professional ethical obligations to conduct litigation expeditiously and in good faith.  Members of the bar should need no further encouragement to avoid vexatious litigation conduct; when it occurs, however, the statute provides a method for sanctioning such conduct.

Section 1988 provides in pertinent part that "[i]n any action or proceeding to enforce a provision of . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the cost . . . ."  42 U.S.C. § 1988(b).  In the Circuit's recent decision in <u>Roth v. Green</u>, ___ F.3d ___, 2006 WL 3059921, at *13 (10th Cir. Oct. 30, 2006), the court discussed this provision and stated:

> Construing this statute, the Supreme Court has held that the prevailing party in a civil rights case "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." <u>Newman v. Piggie Park Enterp.</u>, 390 U.S. 400, 402, 88 S. Ct. 964 (1968).

In <u>Roth v. Green</u>, attorneys who were sanctioned with a fee award argued that the inability to pay should have been considered by the court in deciding whether to award fees.  The circuit concluded that inability to pay was not a proper factor in determining *whether* to award attorney fees, but was a proper factor in *fixing the amount of* such award.  <u>Alizadeh v. Safeway Stores, Inc.</u>, 910 F.2d 234, 238-39 (5th Cir. 1990)(holding that a party's financial condition is not a proper factor to consider in determining whether to award fees against that party, but is a factor that should be considered in fixing the amount of such award); <u>Miller v. Los Angeles County Bd. of Education</u>, 827 F. 2d 617, 621 (9th Cir. 1987)(holding that the amount of an award should not subject the non-prevailing plaintiff to financial ruin).

16

Under <u>Roth v. Green</u>, it was entirely proper for the trial judge in this case to award fees without consideration of Sizemore's ability to pay, just as it is entirely appropriate at this juncture to consider her ability to pay in fixing the appropriate amount. The Court can and must consider those factors in determining the amount of the award. <u>Id.</u>

The evidence presented demonstrates that Sizemore is unemployed and unemployable. She has been without employment income since the loss of her job. She is suffering from a rare form of cancer--multiple myeloma. She describes her condition as incurable, save for the possibility presented by an experimental stem cell transplant. Her condition causes the marrow within her bones to expand to the extent that the expanding marrow cracks and breaks bones. Indeed, at the evidentiary hearing, she testified that she currently had broken and cracked ribs, together with cracks and fractures along her spinal column due to this condition. This progressively deteriorating condition makes it impossible for Sizemore to return to a working or income-producing environment.

The University of Arkansas International Myeloma Treatment Center proposed an experimental stem cell transplant in an effort to treat Sizemore's condition with the hope of prolonging her life. The procedure is extensive, expensive and requires a regimen of chemotherapy prior to the transplant. Sizemore will likely be incapacitated for up to six months if the transplant is successful. There are no guarantees that the procedure will be effective.

Sizemore's cash flow comes from her share of her former husband's military pension. She receives $1,650 per month. Her monthly living expenses and her medical treatments exceed her income stream, so, each month, she is required to "draw down" funds from a mutual money market fund, which had a balance of approximately $24,000. As no new funds, save for interest, are added to that account her account balance diminishes each month.

Sizemore testified that her treatment at the University of Arkansas is considered "out-of-network" and, therefore, her healthcare provider requires her to pay 40% of the treatment costs.   If this transplant could be performed within the insurance company's network, a greater portion of the costs could have been paid by her insurer.  These costs are exceedingly expensive, and she anticipates that her portion of the upcoming experimental transplant will be between $30,000 to $50,000.  She testified that her co-pay for a recent out-of-network MRI at the University of Arkansas was $6,700. As these expenses exceed her monthly cash flow, she charges the health care co-pays on her MasterCard charge account.

In addition to Sizemore's out-of-network co-pays, she testified that her prescription costs to treat her medical condition are very expensive, and that she has spent over $10,000 in co-pays for medication.  For example, she is treated with Thalidomide at a cost to her of $250 per month.  She has also incurred, and will continue to incur, housing and transportation costs related to her out-of-state treatment.  Sizemore has requested insurance company reimbursement for her reasonable and necessary medical travel costs, but, to date, those claims have not been approved.

Sizemore has accumulated significant assets in retirement accounts, a home, a money market fund and in raw land.  She owns a home valued at between $200,000 and $250,000, but has a $60,000 mortgage.  Thus, she does have substantial equity in her residence; if forced to sell the home, however, she would have no place to live.  Her other assets include a Public Employee Retirement Pension valued at $83,000 and two IRAs.  The IRAs have substantial value--one with a balance of $396,541 and the second valued at $28,000.  None of those retirement accounts can be drawn upon without substantial penalty, as Sizemore, at the time of the hearing, was not old enough to begin receiving monies from her retirement savings.  Moreover, these funds are intended to provide for her future living and medical needs if the transplant is successful.

Sizemore does own, free and clear, some undeveloped acreage near Belen, New Mexico. She testified, however, that the acreage has been on the market for some time at an asking price of $28,000 and no offers have been made.

Her total savings are substantial, but her available liquid assets are not. Given the precarious nature of her health, and her likely medical needs and ongoing medical and living expenses, she is unable to pay the requested $150,000, plus fees sought by Defendants. Requiring her to use those assets to reimburse Defendants could substantially and adversely impact her ability to receive reasonable and necessary medical treatment and to provide for her living expenses.

The Court earlier concluded that although this litigation was without foundation, it was not brought in subjective bad faith [Doc. 110]. The Court now concludes that, giving consideration to the unique and unfortunate medical situation with which Sizemore is faced, while attorney fees should be awarded to a prevailing party, Sizemore's inability to pay compels the Court to determine that she cannot make any contribution toward attorney fees. The Court recommends that no attorney fees be assessed against Sizemore.

This recommendation may appear at odds with the Court's earlier conclusions that Defendants prevailed, that the litigation was without basis and that attorney fees *should* be awarded. However, as the Court could not earlier consider particular circumstances affecting Sizemore's ability to pay, the recommendation does not conflict with the earlier conclusion, as the Court now finds that she can't pay.

Defendants did prevail; the litigation was without foundation; and attorney fees should be awarded. Indeed, if Sizemore were not afflicted with a condition that could well result in her death, if she had substantial liquid assets not required for her potential life-saving treatment, the Court would award fees. That, unfortunately for all, is not the case.

Defendant State of New Mexico makes a separate request for an award of fees against attorney Dennis Montoya pursuant to 28 U.S.C. § 1927.  The State's request is in the alternative. First, the State requests recovery of all fees incurred in this case because the lawsuit was frivolous and should not have been prosecuted.  Alternatively, the State argues that the fees incurred as of April 18, 2005, the date the Court granted the State Defendants' motion for summary judgment, needlessly, unreasonably and vexatiously increased the State's fees.

Thus, the issue before the Court is consideration of the amount of fees that should be awarded to the State Defendants against Sizemore's attorney, Dennis Montoya, pursuant to § 1927.[6]  This Court already concluded that Sizemore's claims against the State Defendants were unreasonable and without foundation [Doc. 110, at 1]. Montoya's conduct as an attorney in this case was inappropriate. He missed deadlines, he failed to respond to motions, and his post-summary judgment litigation ran up the costs and fees for State Defendants.  However, this Court also concluded that the lawsuit was not brought in subjective bad faith.  Montoya acted poorly, but he didn't prosecute the action with subjective bad faith.  The Court determines that his inadequate performance, albeit not in bad faith, should not subject him to a monetary sanction for all of the fees the State Defendants incurred. Rather, the proper sanction would be to award the State Defendants the fees they incurred after summary judgment was granted on April 18, 2005, because those fees are attributable to Montoya's litigation practices which needlessly increased the State's fees.

Notwithstanding the Court's ruling on the motion for summary judgment, Mr. Montoya continued to litigate with multiple motions seeking reconsideration or to set aside the Court's determination or to file out-of-time responses.  Those acts prolonged litigation and served only to

---

[6]The RCI Defendants did not seek attorney fees against counsel under 28 U.S.C. § 1927.

"run up the bill."

A review of the billing statements demonstrates that the State of New Mexico incurred the sum of $6,448.50 subsequent to the summary judgment of April 18, 2005. Those fees would not have been incurred had Mr. Montoya simply accepted the Court's analysis and ruling, and his persistence in litigating this case, especially after the Court found no foundation, needlessly increased the fees for the Defendants.

The Court determines that Mr. Montoya's litigation activities after the summary judgment ruling on April 18, 2005 needlessly increased the Defendants' costs of litigation, and Montoya's litigation activities subsequent to April 18, 2005 were unreasonable. Defendants' alternative request for fees, that is, fees incurred after April 18, 2005, is reasonable and will be granted. Mr. Montoya has not shown cause why he is unable to respond to an award of fees in the amount of $6,448.50, nor has he demonstrated the existence of any special circumstances that would warrant a reduction in those fees. Indeed, his attorney requested if fees are to be assessed at all, that the State's alternative relief be granted.[7] [Transcript, Aug. 29, 2006, pp. 175, 176]. Therefore, the Court recommends that Mr. Montoya be assessed attorney fees in the amount of $6,448.50, payable under § 1927 to the State of New Mexico.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge

---

[7] One special circumstance that does exist is that Mr. Montoya is represented in this proceeding by his legal malpractice carrier pursuant to a reservation of rights. His carrier advised that sanction awards are not covered by the terms of the policy. Thus, any award made against Mr. Montoya would likely be paid by Mr. Montoya himself and not his insurance carrier.